**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
JACQUES MIANGO, *et al.*,               )
                                        )
              Plaintiff,                )
                                        )
       v.                               )        Civil Action No. 15-1265 (ABJ)
                                        )
DEMOCRATIC REPUBLIC                     )
OF THE CONGO, *et al.*,                 )
                                        )
              Defendant.                )
_____)

## MEMORANDUM OPINION

Plaintiffs Jacques Miango, Andre Ngoma, Matala Kayaya, and Ouwo Likutu, allege that

they were beaten by security forces of the Democratic Republic of the Congo ("DRC") when they

staged a protest across the street from the Washington, D.C. hotel where the DRC President and

his delegation were staying.  According to the complaint, the beating on the sidewalk across from

the Capella Georgetown Hotel took place in full view of officers of the District of Columbia

Metropolitan Police Department ("MPD") and agents of the United States Secret Service ("Secret

Service" or "USSS") who declined to intervene.[1]  Second Am. Compl. [Dkt. # 39] ¶ 1.  Plaintiffs

have brought negligence claims and claims under 42 U.S.C. § 1983 against the law enforcement

agencies, alleging that both entities negligently failed to do anything to stop the DRC forces and

that they are liable for the violations of plaintiffs' constitutional rights that took place that day.

*See id.* ¶¶ 61–71, 133–44, 164–72.  Plaintiffs also brought section 1983, negligence, and intentional

tort claims against the companies that own and operate the Capella Hotel – Capella Hotels Group,

---

1    Plaintiffs have also filed claims against the DRC, several of its officials, and its security
forces, in their official and individual capacities.  *See* Second Am. Compl.  This opinion deals only
with plaintiffs' claims against MPD, the Secret Service, and the companies that own the Capella
Hotel.

LLC ("Capella") and Castleton Hotel Partners, LLC ("Castleton") (together "the hotel companies") – *id.* ¶¶ 10–11, claiming that because the hotel companies housed the DRC security forces and failed to prevent them from assaulting plaintiffs, they acted negligently, violated plaintiffs' constitutional rights, and bear responsibility under the doctrine of *respondeat superior* for the alleged assault, trespassing, conversion, and theft committed by the DRC.  *See id.* ¶¶ 61–71, 126–32, 157–63, 173–77.  Finally, plaintiffs Miango and his wife, Micheline Miango ("M. Miango"), have filed a loss of consortium claim against MPD, the Secret Service, and the hotel companies, which is derivative of Miango's negligence claims, and alleges that as a result of the attack on Miango, plaintiff and his wife have suffered a loss of marital relations.  *Id.* ¶¶ 178–82.

On August 17 and 18, 2016, MPD and the hotel companies moved to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Metropolitan Police Department's Mot. to Dismiss [Dkt. # 66] ("MPD Mot.") at 1; Mem. P. & A. in Supp. of MPD's Mot. ("MPD Mem."); The Capella Group's Mot. to Dismiss Pls.' Second Am. Compl. [Dkt. # 67] ("Capella Mot.") at 1.  And on December 19, 2016, the Secret Service moved to dismiss the second amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Federal Defs.' Mot. to Dismiss Pls.' Compl. [Dkt. # 85] ("USSS Mot.") at 1; Mem. of P. & A. in Supp. of USSS Mot. ("USSS Mem.").

Assuming that the complaint is true, it contains disturbing allegations that plaintiffs were seriously injured by the DRC security forces, and one can readily understand why plaintiffs are frustrated by the fact that U.S. law enforcement officers stood by while it happened.  But applying the law as the Court is bound to do, the Court finds that the complaint does not set forth a legal basis to hold MPD, the Secret Service, or the hotel companies responsible for plaintiffs' injuries, and therefore, all three motions to dismiss will be granted.

## FACTUAL BACKGROUND

Plaintiff Jacques Miango is a refugee of the DRC who currently lives in Maryland.  Second Am. Compl. ¶ 2.  He describes himself as "a known opponent and activist against the DRC government['s] human rights violations," *id.*, and along with the other plaintiffs, he makes the following allegations in the complaint:

On August 1 through 6, 2014, the President of the DRC, Joseph Kabila Kabange ("President Kabila"), attended the "U.S. – Africa Leaders' Summit" in Washington D.C.  Second Am. Compl. ¶¶ 7, 22.  During his visit, President Kabila and his delegation stayed at the Capella Hotel.  *Id.* ¶¶ 22, 24.

On August 6, 2014, plaintiffs Miango, Kayaya, and Likutu staged a protest against the DRC on the sidewalk across the street from the Capella Hotel.  Second Am. Compl. ¶¶ 24, 27.  Although Miango sought a permit from MPD for the protest, he was informed that he did not need one because his group would include less than twenty people.  *Id.* ¶ 25.  Miango observed both MPD officers and Secret Service agents in front of the hotel on that date.  *Id.* ¶ 26.

Shortly after Miango, Kayaya, and Likutu arrived, the DRC's press official, defendant Jeanmarie Kassamba, returned to the hotel.  Second Am. Compl. ¶ 27.  Miango and his fellow protestors shouted at defendant Kassamba and held up signs condemning rape, corruption, genocide, dictatorship, and human rights violations in the DRC.  *Id*.  Then, defendant Kassamba entered the hotel and came back out with "apparent security enforcers of the Kabila regime."  *Id.* ¶ 28.  Plaintiffs claim that the DRC security forces approached Miango and "began belittling, threatening, intimidating and disrupting" him and the other protestors.  *Id*.  Soon after, President Kabila arrived at the hotel.  *Id.* ¶ 31.  Miango started shouting at him, and plaintiffs claim that

President Kabila recognized Miango as a "dissident." *Id.* President Kabila then entered the hotel. *Id.* ¶ 32.

After President Kabila entered the hotel, another group of DRC security forces allegedly "rushed out" of the building and joined the security group already harassing Miango and the other protestors. Second Am. Compl. ¶ 32. They "immediately began physically attacking" the protestors, and Miango was "knocked down to the ground, beaten, kicked, choked, and stomped on" by the security forces. *Id.* As a result, Miango lost several teeth, suffered a concussion, and injured his spine and neck. *Id.* Plaintiffs allege that after the DRC security forces beat Miango, they broke into his parked car and stole, among other things, protest materials, a computer, an iPod, and a camera. *Id.* ¶ 34.

Plaintiff Ngoma was working at the Canal Inn Hotel located across the street from the Capella Hotel at the time of the protest, and he came outside to observe it. Second Am. Compl. ¶ 35. Plaintiffs claim that the security forces beating Miango saw Ngoma and believed he was a part of the protest, so they attacked him as well. *Id.*

Plaintiffs allege that during all of these events, MPD officers and Secret Service agents on the scene observed what took place but took no action except to usher away the attackers after they had beaten Miango. Second Am. Compl. ¶¶ 1, 26–27, 30, 33–34, 36. They also claim that similar incidents occurred on August 5 and 6, 2014 in front of the Hays Adams Hotel in Washington D.C., when security forces from The Gambia, another African country, beat protesters in full view of law enforcement agents. *Id.* ¶ 23.

## PROCEDURAL HISTORY

On January 5, 2015, counsel for plaintiff Miango sent a demand letter to the Secret Service setting forth claims of negligence, constitutional violations, dereliction of duty, and discrimination

arising out of the August 6, 2014 incident outside of the Capella Hotel. Ex. 1 to USSS Mot. [Dkt. # 85-1]. The letter stated that Miango was "accompanied by one or two person[s]" during the incident and that "the other protestor ran away." *Id.* It also demanded $10,000,000 in personal injury damages for Miango without identifying any other claimants. *Id.* The Secret Service responded by letter on April 27, 2015. It stated that it had received Miango's demand letter and asked Miango to re-submit his claim using an enclosed Standard Form 95 if he sought to "proceed with a claim against the Secret Service under the [Federal Torts Claims Act]." Ex. 2 to USSS Mot. [Dkt. # 85-2]. On September 26, 2016, after this lawsuit had already been filed, all five plaintiffs sent individually completed forms to the Secret Service. Ex. 3 to USSS Mot. [Dkt. # 85-3]. Each plaintiff claimed $10,000,000 in personal injury damages. *Id.*

Plaintiffs Miango, his wife, M. Miango, and Ngoma filed this action on August 6, 2015. Compl. [Dkt. # 1]. The complaint was amended on February 29, 2016, Am. Compl. [Dkt. # 10], and again on May 10, 2016. *See* Second Am. Compl.[2] It contains the following counts:

- Count I:  Crimes Against Humanity in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count II:  Cruel and Degrading Treatment in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count III:  Deprivation of Constitutional and Civil Rights in Violation of 42 U.S.C. §§ 1983, 1988 (First Amendment Freedom of Speech and Assembly) against all defendants;

- Count IV:  Deprivation of Right to Enter One's Own Country in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

---

2      The current operative complaint added plaintiffs Likutu and Kayaya and reinstated several claims against MPD, USSS, and the hotel companies.

- Count V:  Infringement Upon Rights to Free Expression, Assembly, Thought, and Association in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count VI:  Deprivation of Equal Protection Under the Law in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count VII:  Aiding and Abetting Acts in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count VIII:  Battery against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count IX:  Assault against the individual/official capacity defendants, the DRC, Joseph Kabila, and the hotel companies;

- Count X:   Deprivation of Constitutional and Civil Rights in Violation of 42 U.S.C. §§ 1983, 1988 ("First Amendment Freedom of Speech And Assembly Clause, Fourth Amendment Due Process and Search and Seizure Clauses, Fifth Amendment Cruel and Unusual Punishment Clause, Fifth Amendment Takings Clause, and Fourteenth Amendment Equal Protection Clause") against the DRC, Joseph Kabila, MPD, and the Secret Service;

- Count XI:  Intentional Infliction of Emotional Distress against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count XII:  False Imprisonment against the individual/official capacity defendants, the Democratic Republic of Congo Government, the Embassy of the Democratic Republic of Congo, and Joseph Kabila;

- Count XIII:  Negligence against the hotel companies;

- Count XIV:  Negligence against MPD and the Secret Service;

- Count XV:  Trespassing, Conversion and Theft against the individual/official capacity defendants, the Democratic Republic of Congo Government, Joseph Kabila, and the hotel companies; and

- Count XVI:  Loss of Consortium against all defendants.

Only MPD, the Secret Service, and the hotel companies have responded to date, all with motions to dismiss.[3]  So this memorandum opinion addresses only the allegations against those defendants.[4]

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## I.    Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan*

---

3    Capella filed a motion to dismiss, Capella Mot., and in a step that is generally permitted under the Federal Rules, Castleton joined in that motion.  Castleton Praecipe Joining Capella Mot. [Dkt. # 83] ("Castleton Praecipe"); *see United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 53 (D.D.C. 2014) ("In most instances, joining and incorporating the legal arguments of a co-party is common . . . .  The same or similar legal arguments can often be made on behalf of many parties."); *Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 121 (D.D.C. 2012) (permitting joining a motion to dismiss).

4    The motions have been fully briefed.  *See* Pls.' Resp. in Opp. to Capella Mot. [Dkt. # 69] ("Pls.' Capella Opp."); Reply to Pls.' Capella Opp. [Dkt. # 71] ("Capella Reply"); Pls.' Resp. in Opp. to MPD Mot. [Dkt. # 70] ("Pls.' MPD Opp."); Reply to Pls.' MPD Opp. [Dkt. # 73] ("MPD Reply"); Pls.' Resp. in Opp. to USSS Mot. [Dkt. # 86] ("Pls.' USSS Opp."); Reply in Supp. of USSS Mot. [Dkt. # 87] ("USSS Reply").

*v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm.*, *Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.   Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable

to legal conclusions." *Id.* And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 566. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in the plaintiff's favor, and the Court should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *see also Browning*, 292 F.3d at 242. In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

## ANALYSIS

### I.      MPD's Motion to Dismiss

The D.C. Metropolitan Police Department has moved to dismiss all of the claims against it on the ground that it is *non sui juris*, that is, that it lacks the legal capacity to be sued. MPD Mem.

at 4–5.  This is a correct statement of the law, but the Court recognizes that plaintiffs' complaint alleges that MPD "is an agency of the District of Columbia municipality" and that plaintiffs' claims involve "MPD officers."  Second. Am. Compl. ¶ 9.  So the Court will proceed with its analysis as if plaintiffs had properly named the District of Columbia as a defendant.

The District asserts that plaintiffs have failed to state a claim against the municipality under section 1983 because they have not sufficiently alleged that a custom or policy of the District was the cause of plaintiffs' injuries at the hands of the DRC.  MPD Mem. at 7–10.  It also contends that it is immune from actions for negligence under the public duty doctrine.  *Id.* at 11–14.  Since the District is correct on both counts, all of plaintiffs' claims against MPD will be dismissed for failure to state a claim upon which relief can be granted.

### A.    MPD is *Non Sui Juris*.

Certain government entities are not suable because they are not entities "which Congress has authorized to be sued."  *Blackmar v. Guerre*, 342 U.S. 512, 515 (1952); *see Sibley v. U.S. Supreme Court*, 786 F. Supp. 2d 338, 344 (D.D.C. 2001) ("In the absence of explicit statutory authorization, bodies within the District of Columbia government are not suable as separate entities."), quoting *Daskalea v. Wash. Humane Soc'y*, 480 F. Supp. 2d 16, 22 (D.D.C. 2007).  Specifically, courts within this Circuit have determined that MPD "is a noncorporate department or body within the District of Columbia and is not suable as a separate entity."  *Aleotti v. Baars*, 896 F. Supp. 1, 6 (D.D.C. 1995), citing *Fields v. D.C. Dep't of Corrections*, 789 F. Supp. 20, 22 (D.D.C. 1992).  And an examination of the statute that creates MPD shows that it contains no provision allowing suit against it.  *See* D.C. Code § 5-101.01 *et. seq.*

Since no statute authorizes suit against MPD, plaintiffs' claims against it must be dismissed.  However, the District of Columbia may be substituted as the defendant.  *See Sampson*

*v. D.C. Dep't of Corrections*, 20 F. Supp. 3d 282, 285 (D.D.C. 2014) ("When a plaintiff erroneously names as a defendant a District of Columbia agency instead of the District of Columbia itself, a court may substitute the District as a defendant for its agency.").

**B.     Plaintiffs have failed to state a claim of municipal liability under section 1983.**

### 1.     Legal Standard

Plaintiffs have failed to state a proper claim against the District of Columbia under section 1983.  The statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983.

As the Supreme Court stated in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  Where, as here, a plaintiff seeks to hold a municipality liable under section 1983, the municipality must have acted in accordance with a "government[] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," that "caused a constitutional" violation and that "inflicts the injury."  *Monell*, 436 U.S. at 691, 694.

In the years after *Monell,* the Supreme Court has reaffirmed this holding.  "[W]hile Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others.*"  *Pembaur v. City of Cincinnati,* 475 U.S 469, 479 (1986) (emphasis in original), citing *Monell*, 436 U.S. at 665–83.  "The 'official policy'

requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* This requirement flows directly from the statute itself.

In *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), the Court of Appeals explained that a district court assessing a section 1983 claim must ask two questions. First, does the complaint state a claim for a predicate constitutional violation? *Id.* Second, if so, does the complaint state a "claim that a custom or policy of the municipality caused the violation?" *Id.* To satisfy the first prong of the analysis, all that needs to be established "is some constitutional harm suffered by the plaintiff;" it is not necessary that the municipality's policy makers or employees be implicated. *Id.* To meet the second prong, the court must determine whether the plaintiff has alleged an "affirmative link" between the municipality's policy and the injury "such that a municipal policy was the 'moving force' behind the constitutional violation." *Id.*, citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) and *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

The *Baker* court explained:

> There are a number of ways in which a "policy" can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution . . . ; the action of a policy maker within the government . . . ; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom" . . . ; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Id.* at 1306 (internal citations omitted). Plaintiffs' complaint appears to set forth two theories of liability: (1) the existence of a municipal policy, and (2) deliberate indifference.

### 2.    Express Municipal Policy

Plaintiffs allege in Count III that all of the defendants deprived them of their constitutional rights.  The count is entitled, "Deprivation of Constitutional and Civil Rights . . . First Amendment Freedom of Speech and Assembly," but the paragraphs that comprise that count allege that defendants deprived plaintiffs of liberty and security without due process.    Second Am. Compl. ¶¶ 61, 64. The count specifies that the DRC "individual/official capacity defendants" deprived plaintiff Miango of his rights by surrounding, beating, and threatening him, *id.* ¶ 66, and other than incorporating the rest of the complaint, it contains no allegations concerning acts or omissions by MPD officers.

Count X alleges that the DRC, President Kabila, Secret Service, and MPD deprived plaintiffs "of their constitutional and civil rights to free speech and assembly, due process, prohibition against cruel and unusual punishment, prohibition against seizure without just compensation, and equal protection of the law" under the First, Fourth, Fifth, and Fourteenth Amendments.   Second Am. Compl. ¶ 133.[5]   Plaintiffs claim that the DRC "individual/official capacity defendants" violated plaintiffs' rights to free speech, due process, and other protections "by battering and assaulting" them for staging the protest against President Kabila and seizing their belongings. *Id.* ¶ 138.  They add that MPD's "policies and/or protocol and/or practice of protecting foreign government dignitaries and their entourage, provided a cover for the assault and battery against [p]laintiffs, and directly and proximately caused the violation of [p]laintiff Miango's and Ngoma's constitutional rights." *Id.* ¶ 141.  These allegations are insufficient to satisfy the two-prong test set forth in *Baker*.

---

5    Plaintiffs seem to misapprehend the focus of the cruel and unusual punishment clause, and they incorrectly suggest that it is found in the Fifth Amendment.

First of all, even though the first prong of the *Baker* test requires only "some constitutional harm suffered by the plaintiff," 326 F.3d at 1306, it is highly questionable whether plaintiffs have alleged the necessary predicate constitutional violation.   Count III complains of what it characterizes as an unconstitutional assault perpetrated by foreign officials and security guards, but it does not claim that any U.S. federal or state government actor deprived Miango of his liberty, and therefore, it does not allege any constitutional violation.[6]   *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) ("Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.").   And the assault alleged in Count X to be in response to plaintiffs' demonstration was carried out by the DRC, so that count also fails to allege an infringement of plaintiffs' First Amendment rights – or any other constitutional rights – by a U.S. official bound by the Constitution's requirements.   *See* Second

---

[6]      In Count III, plaintiffs do conclusorily allege that the "individual/official capacity defendants" acted "under the color of state authority and/or actual or apparent state authority" when they deprived plaintiff Miango of his rights.  Second Am. Compl. ¶ 66.  But the use of this snippet of language from section 1983 does not give rise to an inference that the perpetrators of the assault were acting under color of the law of the District of Columbia or any U.S. state; instead, this Count plainly alleges that any deprivation of rights was carried out under color of the authority of the DRC.  The "individual/official capacity defendants" are defined in the complaint to be DRC "nationals, officials, agents, representatives, friends, and/or officers of DR Congo Government and or Defendant Joseph Kabila."  *Id.* ¶ 12.  The allegations in Count III relate to the actions undertaken by those individuals – surrounding plaintiff Miango, ensuring that he could not escape, beating him, and subsequently issuing death threats against him – and Count III specifically alleges that defendants DRC and Kabila should be liable for damages for those actions "via direct order and/or command responsibility and/or respondeat superior."  *Id.* ¶¶ 66–67.  And while Count III is entitled "Deprivation of Constitutional and Civil Rights in Violation of 42 U.S.C. §§ 1983, 1988 (First Amendment Freedom of Speech and Assembly)," it alleges that deprivation of liberty and security by a state without due process is a violation of the law of nations, *id.* ¶¶ 64–65, not the U.S. Constitution, and it does not mention First Amendment rights at all.

Am. Compl. ¶ 138.  Without an underlying constitutional violation, a *Monell* claim fails to get out of the starting gate.[7]

But even if DRC representatives could be held legally responsible for a violation of the U.S. Constitution, or if the complaint could be generously construed to allege that it was the MPD officers' mere failure to intervene that infringed on plaintiffs' right to speak and assemble, the conclusory assertion that MPD's "policies and/or protocol and/or practice of protecting foreign dignitaries and their entourage, provided a cover for the assault and battery against [p]laintiffs, and directly and proximately caused the violation of [p]laintiff Miango's and Ngoma's constitutional rights," Second Am. Compl. ¶ 141, is insufficient to satisfy the causation element of the test. Plaintiffs fail to plead any facts showing what, if any, official policy the District has regarding foreign dignitaries or how that policy may have led to the visitors' decision to initiate the attack or the officers' actions that day.  The complaint includes no factual allegations regarding the existence or enforcement of a municipal policy, custom, or practice, and it fails to supply any facts from which one could infer the existence of an "affirmative link" between any alleged policy to protect foreign dignitaries and the injuries plaintiffs suffered at the hands of President Kabila's security detail.  In the absence of any factual allegations that would establish the necessary constitutional violation or the causal connection between an official policy and that violation, the complaint fails to state a section 1983 claim against the District.

---

7       Plaintiffs' claims against MPD and the Secret Service under the Fourteenth Amendment will be dismissed because the Fourteenth Amendment does not apply to the District of Columbia or the federal government. *See S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n.22 (1987) (holding that the Fourteenth Amendment only applies to actions by a State and not by the federal government); *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954) (observing that the Fifth Amendment is applicable to the District of Columbia, but the Fourteenth Amendment is not).

### 3.      Deliberate Indifference

Plaintiffs' deliberate indifference theory of municipal liability also fails.  The Supreme Court has held that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Harris*, 489 U.S. at 388.  In such a situation, "a local government's decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

According to *Baker,* deliberate indifference is measured according to an objective standard: "whether the municipality knew or should have known of the risk of constitutional violations." 326 F. 3d at 1307.  But it is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," *Connick*, 563 U.S. at 61, quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997), usually requiring "[a] pattern of similar constitutional violations."  *Id.* at 62, citing *Brown*, 520 U.S. at 409.  On rare occasions, a single unconstitutional incident may suffice to show deliberate indifference if the unconstitutional consequences of failing to train are so "highly predictable" and "patently obvious."  *Id.* at 64, citing *Brown*, 520 U.S. at 409.

Plaintiffs' complaint fails to allege sufficient facts to show that the District "disregarded a known or obvious consequence" of its supposed failure to train its officers to restrain violence by foreign dignitaries against civilians.  *Connick*, 563 U.S. at 61.  Plaintiffs include only one allegation in their complaint to advance this theory:  "DCMPD's failure to train their agents and/or officers in preventing and/or mitigating acts of violence committed by foreign government personnel against civilians . . . amounts to deliberate indifference by defendants."  Second Am. Compl. ¶ 142.

This claim is completely conclusory.  The complaint does not supply facts from which a court could draw the inference that the District ignored a known risk, and it includes no specific details about police training in the District or how it might be deficient.  *See Bell v. District of Columbia*, 82 F. Supp. 3d 151, 158 (D.D.C. 2015) ("The complete absence of any factual allegations concerning a specific shortcoming in training forecloses any plausible inference of 'actual or constructive knowledge' by District policymakers that its officers will 'probably violate constitutional rights.'"), quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2003).

Moreover, the Court cannot conclude that MPD did not properly train its officers simply because individual officers failed to act.  *See Harris*, 489 U.S. at 390–91 ("That a particular officer may be unsatisfactorily trained will not alone suffice . . ., for the officer's shortcomings may have resulted from factors other than a faulty training program.").  Since the complaint contains no factual allegations detailing any deficiencies in MPD training on how officers should respond to violence committed by agents of foreign dignitaries in their presence, plaintiffs' section 1983 allegations amount to nothing more than simply a "formulaic recitation" of the elements of a deliberate indifference claim, and dismissal is warranted.[8]  *See Martin v. District of Columbia*, 720

---

[8]     Plaintiffs do not allege sufficient facts to demonstrate that the municipality knew or should have known that foreign dignitaries would violently attack civilians on American soil and violate their constitutional rights in the absence of adequate local police training.  They state that on August 5, 2014 and August 6, 2014, "protesters gathered in front of the Hays Adams Hotel in Washington, D.C." where "the delegation from The Gambia was staying," and that Gambian security forces "beat several of the protesters" in the "presence of USSS and DCMPD agents." Second Am. Compl. ¶ 23.  Although a single unconstitutional incident may be enough to show deliberate indifference by a municipality in some circumstances, *see Connick*, 563 U.S. at 64, citing *Brown*, 520 U.S. at 409, this practically simultaneous similar incident does not suffice to give rise to an inference that there was a "highly predictable" and "patently obvious" risk of additional constitutional violations occasioned by MPD officers.  *See id.* (observing that failing to train officers on how to use specific tools and deadly force when attempting to arrest fleeing felons would meet the level of "highly predictable" of violating someone's constitutional rights), citing *Brown*, 520 U.S. at 409.

F. Supp. 2d 19, 23–24 (D.D.C. 2010), citing *Smith v. District of Columbia*, 674 F. Supp. 2d 209, 212 (D.D.C. 2009) and *Iqbal*, 446 U.S. at 698.

Therefore, Counts III and X, which assert constitutional claims against the District under section 1983, will be dismissed.

### 4. Plaintiffs' negligence claims against the District are barred by the public duty doctrine.

Plaintiffs' negligence claims against the District also fail when one tests them against the applicable District of Columbia legal precedent.

"Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state" because "[t]here is no federal general common law." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995) ("[A] federal court applies state law when it decides an issue not addressed by federal law . . . ."). "The Court applies the law of the forum state – in this instance, the District of Columbia – when adjudicating common law claims." *Young v. District of Columbia*, 107 F. Supp. 3d 69, 82 n.8 (D.D.C. 2015). So, the Court will apply District of Columbia law to plaintiffs' common law claims.[9]

It is a fundamental principle "that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." *Warren v. District of Columbia*, 444 A.2d 1, 4 (D.C. 1981), citing *Turner v. United States*, 248 U.S. 354, 357–58 (1919). That is true of "law enforcement services and services akin to police and fire protection," *Powell v. District of Columbia*, 602 A.2d 1123, 1128 (D.C. 1992), including "actions as well as inactions by District government employees." *Id.* "Rather, the duty owed is to the

---

9       No party to any of the pending motions to dismiss disputes the applicability of District of Columbia law to plaintiffs' common law claims.

public, and absent a special relationship, the District of Columbia cannot be held liable." *Platt v. District of Columbia*, 467 A.2d 149, 151 (D.C. 1983), citing *Warren*, 444 A.2d at 4.  In order to convert this general duty owed to the public to a special duty, two additional elements are necessary:  "(1) a direct contact or continuing contact between the victim and the governmental agency or official; and (2) a justifiable reliance on the part of the victim." *Id*.

"[I]n the area of police services . . . a special legal duty is created 'when there is a course of conduct, special knowledge of possible harm, or the actual use of individuals in the [criminal] investigation.'" *Powell*, 602 A.2d at 1129.  Ultimately, there must be "some form of privity between the police department and the victim that sets the victim apart from the general public . . . . That is, the victim must become a reasonably foreseeable plaintiff." *Id.* at 1130, quoting *Warren*, 444 A.2d at 10.  The required contact must, in other words, be a "direct transaction with the person injured" or "an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured." *Id.*, quoting *City of Tampa v. Davis*, 226 So.2d 450, 452–53 (Fla. 2d Dist. Ct. App. 1969).

A review of the complaint reveals that plaintiffs are predicating their claims solely on the basis of a general duty to protect the public, which cannot supply a basis for liability under the public duty doctrine.  *See* Second Am. Compl. ¶ 166 ("DCMPD owed a duty to act to provide security *to the public*, and prevent [the DRC] from attacking members of the public.") (emphasis added); *id.* ¶ 169 ("DCMPD owed *members of the public* a duty of care to adequately train, maintain, and control their personnel.") (emphasis added).  The police department cannot be held liable for its failure to uphold its duty to the general public, *see Platt*, 467 A.2d at 151, so plaintiffs' negligence claims against the District must be dismissed.

Plaintiffs argue in their opposition to the motion to dismiss that this is a special duty case, but even read in the light most favorable to plaintiffs, the complaint does not allege sufficient facts to establish a special relationship between plaintiffs and MPD.  Plaintiffs contend that MPD owed them a special duty to ensure their protection because it was aware of plaintiffs' plans to engage in a peaceful political protest.  Pls.' MPD Opp. at 25.  However, this information alone is not enough to create a level of privity between MPD and plaintiffs that would differentiate them from the general public.  *See Platt*, 467 A.2d at 152 (finding the "mere posting of a certificate of occupancy on the Club premises" did not create a special relationship with District officials who had inspected the building and a fire subsequently killed trapped patrons); *Warren*, 444 A.2d at 8–9 (concluding that an emergency phone call by a rape victim, followed by inadequate police investigation, was not sufficient to establish a special relationship or justifiable reliance); *cf. Powell*, 602 A.2d at 1131 (finding a special relationship existed where appellant registered for and received a permit for her car and the District incorrectly entered her information into the system causing her to be fined).

Here, Miango claims that he "sought to obtain a permit" for the protest but was informed that a permit was unnecessary given the size of his group.  Second. Am. Compl. ¶ 25.  Plaintiffs do not provide facts indicating that Miango had any additional interactions with District personnel, nor do they even allege when Miango had this single conversation.  The information that a protest would be held did not put the police on notice of any particular risk of harm to plaintiffs, and there is no allegation that the police undertook any action to afford the protesters any special protection – the dissidents were simply informed that they did not need a permit.  So plaintiffs do not allege sufficient facts to demonstrate that MPD had any "special knowledge of possible harm" to plaintiffs or that the parties engaged in a "course of conduct" that would create a special

relationship.  *See Powell*, 602 A.2d at 1130.  And there are no facts to support a finding that plaintiffs reasonably relied on the officers' special protective services.

Because plaintiffs have failed to allege the existence of a special duty owed to them, plaintiffs' negligence claim against the District is barred by the public duty doctrine and Count XIV will be dismissed as to the District.

## II.     The Secret Service's Motion to Dismiss

The U.S. Secret Service moved to dismiss the negligence and loss of consortium claims brought against it in Counts XIV and XVI, asserting that it is immune from suit under the Federal Tort Claims Act ("FTCA") and that, in any event, plaintiffs have failed to state a claim against it for negligence.  *See* USSS Mot. at 1.

The Court concludes that it does not have jurisdiction under the FTCA to address the negligence claims filed by plaintiffs M. Miango, Ngoma, Kayaya, and Likutu, so those plaintiffs' tort claims will be dismissed under Federal Rule of Civil Procedure 12(b)(1).  The Court does have jurisdiction over plaintiff Miango's tort claims, but he has failed to plead sufficient facts to state a claim for negligence, so Counts XIV and XVI against the Secret Service will be dismissed under Rule 12(b)(6).

Finally, even though the Secret Service has not moved to dismiss the section 1983 claims against it, the Court finds that the agency has not waived its sovereign immunity as to those claims, so Counts III and X will be dismissed because the Court lacks jurisdiction to hear them.

### A.     Plaintiffs' common law tort claims will be dismissed.

The FTCA authorizes certain tort actions against the United States over which the federal district courts maintain exclusive jurisdiction.  *See* 28 U.S.C. § 1346(b)(1).  Tort actions authorized by the FTCA include claims for negligence and loss of consortium.  *See id.*  All five plaintiffs sued

the Secret Service for negligence, and plaintiffs Miango and M. Miango added a loss of consortium claim.  Second Am. Compl. ¶¶ 165–72, 178–82.

Under the FTCA, a tort action against the United States "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401(b); *see* 28 C.F.R. § 14.2(a).  Presentment of a claim occurs when the agency receives "an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident."  28 C.F.R. § 14.2(a); *see also GAF Corp. v. United States*, 818 F.2d 901, 919 (D.C. Cir. 1987) (holding that to meet the presentment requirement, a claimant must file "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum-certain damages claim").

A claim accrues when "a plaintiff 'has discovered both his injury and its cause' even though he is unaware that the harm was 'negligently inflicted.'"  *Sexton v. United States*, 832 F.2d 629, 633 (D.C. Cir. 1987), quoting *United States v. Kubrick*, 444 U.S. 111, 120 (1979).  A party may not institute a civil action against the United States "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency," which includes if the agency fails to "make final disposition of a claim within six months after it is filed."  28 U.S.C. § 2675(a); *GAF Corp.*, 818 F.2d at 918.

## 1.    Waiver of Sovereign Immunity under the FTCA

Plaintiff Miango was the only plaintiff in this case to provide timely written notice as required by the FTCA.  On January 5, 2015, plaintiff Miango's attorney sent a letter to the Secret Service, informing the agency of the incident that occurred outside of the Capella Hotel on August 6, 2014.  *See* Ex. 1 to USSS Mot.  Because Miango provided this written notice within two years

of the incident, and the letter included a claim for damages in the amount of $10,000,000 for personal injuries, the Court finds that Miango presented USSS with notice that was sufficient to meet the jurisdictional requirements of the FTCA. *See GAF Corp.*, 818 F.2d at 922.

Although Miango did not submit the Standard Form 95, his letter identified the acts and omissions of the government that in his view justify a damages award. *See id.* And Miango has "supplied the Government with notice sufficient for it to undertake an investigation of [his] claims and evaluate its potential liabilities." *Id.* Therefore, Miango has met the FTCA's presentment requirements, and the Court has jurisdiction over Miango's negligence and loss of consortium claims.

The other plaintiffs assert that the information contained in the January 5, 2015 letter was sufficient to put the agency on notice of all five plaintiffs' claims even though the letter identified only Miango as a claimant. Pls.' USSS Opp. at 14. Plaintiffs rely on *Tsaknis v. United States*, 517 F. Supp. 2d 295 (D.D.C. 2007) to support their theory that the January letter can serve as proper notice for all plaintiffs because "the factual basis therein is substantially similar if not identical to the factual allegations to support [p]laintiffs' claims in the original and amended pleadings." Pls.' USSS Opp. at 14–15. But the case does not support plaintiffs' argument.

In *Tsaknis*, a claimant filed an administrative claim under the FTCA, notifying the appropriate federal agency within the required two-year period. 517 F. Supp. 2d at 297–98. After the administrative claim was denied, the claimant filed a lawsuit, and the court held that the descriptions within the administrative notice constituted "sufficient notice to satisfy the FTCA presentment requirement," despite the presence of language in the plaintiff's administrative notice that contradicted the legal theory put forth in the lawsuit. *See id.* at 300.

So *Tsaknis* does not stand for the proposition that broad allegations in an administrative notice are enough to give the Court jurisdiction over claims and claimants that are not included in the notice.   Indeed, the opinion makes it clear that in order to meet the FTCA's presentment requirement, each claimant must file his or her own written notice.  *See Tsaknis*, 517 F. Supp. 2d at 297 (observing that one of the deficiencies in the claimants' original administrative notice was that "four claimants filed together when they should have filed separately"), citing *Muth v. United States*, 1 F.3d 246, 249 (4th Cir. 1993) ("[I]f there are multiple claimants in the matter, each claimant must 'individually satisfy the jurisdictional prerequisite of filing a proper claim, unless another is legally entitled to assert such a claim on their behalf.'"), quoting *Frantz v. United States*, 791 F. Supp. 445, 447 (D. Del. 1992); *see also Founding Church of Scientology of Wash., D.C., Inc. v. Dir. FBI*, 459 F. Supp. 748, 755 (D.D.C. 1978) (observing that under the FTCA, "[e]very member of the class must usually comply with the jurisdictional prerequisites in a damage suit").[10]

The other four plaintiffs were bound to comply with the FTCA themselves, and they failed to do so.  The belated Standard Form 95 Claim forms sent on September 26, 2016 fail to serve as a valid waiver of sovereign immunity under the FTCA for plaintiffs M. Miango, Ngoma, Kayaya, and Likutu because the two-year presentment period expired on August 6, 2016.  *See Sexton*, 832 F.2d at 633.  And even if the forms had been timely, those plaintiffs' claims would be dismissed because they did not wait six months after presenting their claims to file suit.  *See* 28 U.S.C. § 2675(a).

_____

10      The Code of Federal Regulations authorizes the filing of an administrative claim on behalf of another under certain limited circumstances, such as when a person is acting as the injured party's "duly authorized agent" or "legal representative,"  28 C.F.R. § 14.3, but there is no claim that those circumstances pertain here.

##### 2.   Plaintiff Miango's Negligence Claim

Like the District, the Secret Service argues that plaintiff Miango's negligence claim is barred by the public duty doctrine.  USSS Mem. at 8–11.  And plaintiff's claim against the Secret Service fails for the same reasons:  it is expressly based on a failure to perform a general duty, and the complaint is devoid of factual allegations that support an inference that any special duty was created.  *See Platt*, 467 A.2d at 151.

As noted above, plaintiff Miango characterizes his negligence claim against the two law enforcement agencies in terms of a general duty to protect the public.  *See* Second Am. Compl. ¶ 166 ("Defendants USSS and DCMPD owed a duty to act to provide security to the public, and prevent [the DRC] from attacking members of the public."); *id.* ¶ 169 ("Defendants USSS and DCMPD owed members of the public a duty of care . . . .").  A federal law enforcement agency cannot be held liable for its failure to uphold its duty to the general public.  *See Platt*, 467 A.2d at 151.

Moreover, plaintiff has not come close to pleading facts to establish a special relationship between himself and the Secret Service.  Plaintiff states that the agents were "present in front of the Capella Georgetown Hotel;" that they "observed Mr. Miango [being] knocked to the ground, beaten, kicked and stomped on;" and that they "took no action to arrest the attackers or prevent the attack and brutal assault of Mr. Miango" except to "usher[] away the attackers."  Second. Am. Compl. ¶¶ 26, 165.  But the complaint does not describe any interaction between Miango and the agents that would give rise to a special relationship.

Plaintiff is similarly conclusory in his opposition to the motion to dismiss, as he posits without factual support that "the federal defendants had a special duty to protect [p]laintiff[] from the attacks on August 6, 2014, and [p]laintiff[] justifiably relied on . . . the federal defendants, to

be protected from attacks because of [his] protest." Pls.' USSS Opp. at 31.  Plaintiff points to the

fact that the local police were notified of the protest, and he asserts that the federal agents should

have known that the DRC and President Kabila would take violent action against the protesters

because of the DRC's history of human rights violations.  *Id.*  But there are no facts in the complaint

from which one could infer that the agents had grounds for concern about risks to plaintiff Miango

on the date in question.  And even if the vague claims in the opposition had been included in the

complaint, they would not be sufficient to create a special duty towards plaintiff that the agents

did not owe to every other member of the public.

Therefore, plaintiff Miango has not alleged an actionable negligence claim against the

Secret Service based on a special duty owed to him, and his claim against the Secret Service in

Count XIV will be dismissed.

### B.     Plaintiffs' section 1983 claims are barred.

Plaintiffs bring two counts against the U.S. Secret Service for deprivation of constitutional

and civil rights under section 1983.  Second Am. Compl. ¶¶ 61–71, 133–44.  Even though the

agency has not moved to dismiss these counts, the Court has an independent obligation to

determine its jurisdiction over these claims.  Fed. R. Civ. P. 12(h)(3) ("If the court determines at

any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *City of

Kenosha v. Bruno*, 412 U.S. 507, 511–12 (1973) (observing that it is the duty of the court to see

that its jurisdiction is not exceeded, even when the parties do not question the court's jurisdiction).

Because section 1983 does not create a cause of action against a federal actor, and there is no other

applicable waiver of sovereign immunity, the Court does not have jurisdiction over a claim against the Secret Service under that statute, and the claim must be dismissed.[11]

"The United States may not be sued without its consent and [] the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  To sue the United States or a federal agency, a waiver of sovereign immunity "must be unequivocally expressed in statutory text." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1105 (D.C. Cir. 2005).

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  This language omits any reference to the federal government.

Congress has made "no statement or other indication that [it] intended to subject federal entities to § 1983 liability." *Settles*, 429 F.3d at 1105.  Moreover, "[s]overeign immunity may not be waived by federal agencies." *Id*.  Therefore, the agency "retains the immunity it is due as an arm of the federal sovereign," *id.* at 1106, and plaintiffs' section 1983 claims against the Secret Service in Counts III and X will be dismissed.

---

11      On March 9, 2017, the Court gave plaintiffs an opportunity to address this issue, and it ordered plaintiffs to show cause "why the Court should not dismiss the section 1983 claims against the U.S. Secret Service in Counts III and X for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(h)(3) on sovereign immunity grounds since section 1983 does not create a cause of action against a federal actor, and the complaint identifies no other applicable waiver of sovereign immunity." Min. Order (Mar. 9, 2017).  Plaintiffs responded to the Court's order on March 17, 2017, Resp. to Order of the Court [Dkt. # 104], but they failed to address the legal problem presented, that is, that section 1983 does not apply to federal officers, and they did not otherwise address the issue of sovereign immunity at all.  Instead, plaintiffs focused on the availability of a qualified immunity defense, and they missed the mark entirely. *Id.* at 7.

**III.     The Hotel Companies' Motion to Dismiss**

Plaintiffs bring the following causes of action against the hotel companies:  deprivation of constitutional and civil rights in violation of 42 U.S.C. § 1983; assault; trespassing, conversion, and theft; negligence; and loss of consortium.  *See* Second Am. Compl.  Defendants contend that all five counts should be dismissed because:  (1) plaintiffs failed to allege that the hotel companies acted under color of state law in order to state a claim under section 1983; (2) defendants cannot be held liable under a *respondeat superior* theory for any common law torts committed by members of the DRC entourage; and (3) defendants did not owe plaintiffs a duty of care, so they cannot be held liable for negligence.  The Court agrees.  Therefore, Counts III, IX, XIII, XV, and XVI against the hotel companies will be dismissed.

**A.     Plaintiffs' section 1983 claim will be dismissed.**

As discussed above, section 1983 authorizes a suit "against any person who, under color of state law, 'subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution.'"  *Nelson v. Campbell*, 541 U.S. 637, 643 (2004), quoting 42 U.S.C. § 1983.  So, "to state a claim under section 1983, the plaintiffs must allege that the defendants (1) acted under color of state law in (2) depriving them of a right secured by the Constitution or by federal law."  *Bates v. Nw. Human Servs. Inc.*, 466 F. Supp. 2d 69, 93–94 (D.D.C. 2006).  The Supreme Court has held that "under color of law" is treated "as the same thing as the 'state action' required under the Fourteenth Amendment."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982), quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966).  Plaintiffs' section 1983 claim must be dismissed because plaintiffs have not alleged that the hotel companies were acting under color of state law.

While there is "[n]o succinct summary [] of what constitutes state action for purposes of applying constitutional safeguards," *Kolinske v. Lubbers*, 712 F.2d 471, 477 (D.C. Cir. 1983), the Supreme Court has identified a host of relevant factors:  whether the challenged activity results from the State's exercise of coercive power; whether the State provides significant encouragement to the activity; and whether a private actor operates as a willful participant in a joint activity with the State or its agents.  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citations omitted).  The crux of the inquiry depends on whether there is such a "close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  *Id.* at 295, quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974).  The D.C. Circuit has characterized this test as depending on whether "a private party acts as an agent of the government in relevant respects."  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015) (concluding that the allegations in the "complaint support the inference that Xerox acted as the District's agent for purposes of determining a person's eligibility for prescription drug coverage under Medicaid"); *see also Daskalea*, 480 F. Supp. 2d at 27 (finding the Washington Humane Society to be a "state actor," and the District's agent, for section 1983 liability because it had been "endowed by the State with powers or functions governmental in nature").

Here, plaintiffs allege that the hotel companies deprived plaintiffs of their First Amendment rights to free speech and assembly since they "relied on and benefitted from" MPD and Secret Service security, Pls.' Capella Opp. at 13, and they provided accommodations to the DRC delegation, whose officials allegedly beat plaintiffs as they protested, stole Miango's possessions, and brought them back into the hotel.  *See* Second Am. Compl. ¶¶ 32, 34, 61–71; Pls.' Capella Opp. at 13–14.  But there is no factual basis for the assertion that the police or Secret Service were

across the street to provide the hotel with protection.  And more important, plaintiffs do not set out

any facts that would give rise to an inference that the hotel employees were acting in concert with

the District or on the District's behalf, or that they were operating under the direction or with the

encouragement of the Secret Service.  "Without state action," the hotel companies' actions "are

only private conduct beyond the pale of constitutional protection."  *Kolinske*, 712 F.2d at 474.

Therefore, the Court will dismiss Count III as to the hotel companies.

        **B.**      **Plaintiffs' common law tort claims will be dismissed.**

           **1.**      **Plaintiffs' *Respondeat Superior* Claims**

Plaintiffs seek to hold the hotel companies liable for assault, trespassing, conversion, and

theft under the doctrine of *respondeat superior* on the theory that the DRC defendants acted as

agents of the Capella Hotel.  *See* Second Am. Compl. ¶ 131.  In order to hold the hotel companies

liable for the acts of the DRC defendants, plaintiffs must establish the existence of an agency

relationship between the Capella Hotel and DRC defendants, and then demonstrate that the DRC

defendants were acting within the scope of that relationship when they allegedly assaulted

plaintiffs and stole Miango's property.  *See Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000).

But plaintiffs have not alleged sufficient facts to establish the existence of such a principal-agent

relationship.  So, plaintiffs' common law tort claims will be dismissed.

"Whether an agency relationship exists in a given situation depends on the particular facts

of each case."  *Judah*, 744 A.2d at 1040, citing *District of Columbia v. Hampton*, 666 A.2d 30, 38

(D.C. 1995).  "The factors to be considered include '(1) the selection and engagement of the

servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's

conduct, (5) and whether the work is part of the regular business of the employer.'"  *Id.*, quoting

*LeGrand v. Ins. Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968).  However, the determinative factor

is whether the principal "has the right to control" the agent's conduct.  *Id.*, quoting *LeGrand*, 241 A.2d at 735.

Plaintiffs maintain that a principal-agent relationship exists because the hotel companies enjoyed a "beneficial relationship" with the DRC officers who provided "security" for the hotel and because the hotel companies "had the right to confront" the DRC security forces.  Pls.' Capella Opp. at 16.  However, plaintiffs have not alleged any facts in the complaint suggesting that the DRC actually provided any security for the hotel companies, as opposed to one of their guests, and they do not allege any of the other indicia of an agency relationship:  that the hotel companies were involved in the hiring of the security forces or had the ability to fire them; that the hotel companies were paying them; that the hotel companies had power to control the conduct of the DRC personnel; or whether providing security is part of the regular business of the hotel.

Whether the hotel received some incidental benefit from the presence of the guards is not a *Judah* factor.  And plaintiffs' unsupported assertion in their opposition that the hotel companies "had the right to confront" the DRC security forces, Pls.' Capella Opp. at 16, bears little resemblance to what is necessary to establish an agency relationship.  What the complaint actually alleges is that the DRC security forces operated at the direction of defendant Kassamba and President Kabila.  *See* Second Am. Compl. ¶¶ 28, 32 (describing that defendant Kassamba "returned with a group" of security enforcers after entering the hotel, and that a second security group "rushed out" of the hotel shortly after President Kabila arrived).

Even if the hotel companies could have complained to the DRC security forces about their behavior, courts demand more to establish a right to control.  For example, in *LeGrand,* the court found a right to control where the principal supervised the work performed by the agent, instructed

the agent how to do the work, corrected the agent's errors, and could dismiss the agent if he was

doing a poor job.  *See* 241 A.2d at 735.

So, plaintiffs' claims of assault, trespassing, conversion, and theft under the doctrine of

*respondeat superior* fail, and Counts IX and XV will be dismissed against the hotel companies.[12]

### 2.      Plaintiffs' Negligence Claim

To establish negligence, "a plaintiff must prove 'a duty of care owed by the defendant to

the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff,

proximately caused by the breach.'"  *District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001),

quoting *Turner v. District of Columbia*, 532 A.2d 662, 666 (D.C. 1987).  Here, plaintiffs contend

that the hotel companies had a duty to protect them from harm on the sidewalk across the street

based on a theory of business-invitor liability.  But the hotel companies did not owe a duty of care

to plaintiffs, so the Court will dismiss plaintiffs' negligence claim against the hotel companies.

### i.      The hotel companies did not owe plaintiffs a duty of care as a business-invitor.

It is "well-settled that a business invitor has a duty of care to its patrons while they are on

its premises."  *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006) (applying

D.C. law); *Smith v. Safeway Stores, Inc.*, 298 A.2d 214, 216 (D.C. 1972) (concluding that a grocery

store has a duty to take "reasonable precautions to maintain the store premises in a condition so as

not to create an unreasonable risk of harm to customers").  A business's duty also "extends to

---

12      Plaintiffs' argument that the existence of an agency relationship is a "question of fact"
misconstrues the nature of the Court's focus at the motion to dismiss stage.  The question at this
stage is only whether, "focusing on the allegations in the complaint, the plaintiffs have adequately
pled the elements of agency liability."  *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 111
n.36 (D.D.C. 2010); *see generally Twombly*, 550 U.S. 544.

protecting its customers from foreseeable harm . . . at its 'exit doorway and the approach thereto.'" *Novak*, 452 F.3d at 908, quoting *Viands v. Safeway Stores*, 107 A.2d 118, 121 (D.C. 1954).

But to extend the doctrine to cover injuries that occur off of a business's premises, the plaintiff must show that the business "made substantial use of [the area] in relation to its business," and the invitee was "attracted to the spot as a calculated or necessary means of ingress or egress or for other business-related purposes." *Compare Quigley's Pharmacy, Inc. v. Beebe*, 261 A.2d 242, 244 (D.C. 1970) (holding that a pharmacy did not owe a duty of care to a member of the public who caught her heel in a hole in the sidewalk while she walked from the pharmacy entrance to a mailbox, twenty feet from the pharmacy entrance), *with Viands*, 107 A.2d at 118 (concluding that a store owed a duty of care to a customer who tripped over a wagon as she exited the store even though the injury did not occur on the business's premises because it was the sole exit from the store and an area that the business put to substantial use), *and Novak*, 452 F.3d at 911 (finding a night club owed a duty of care to its patrons when walking down the alleys surrounding the club because the alleys were put "to a substantial special use" by the club, "no other businesses used the alley," the club "was set off from any public street," and patrons had to "use the alleys as approaches and exits to the club").

Plaintiffs have not alleged sufficient facts to support their contention that the hotel companies owed them a duty of care when they gathered on the opposing sidewalk. Indeed, plaintiffs characterize the negligence claim against the hotel companies as a general breach of duty to the public: plaintiffs allege that the Capella Hotel owed a duty "to provide security and monitor its guests to prevent its guests from causing harm to the public," and that the hotel "breached its duty by failing to act to protect the public . . . ." Second Am. Compl. ¶¶ 158, 160. But plaintiffs

do not provide any support for the proposition that the hotel companies owe any duty of care to the general public.[13]

Plaintiffs do not allege that they were patrons or invitees of the Capella Hotel; nor do they allege any facts that would support a conclusion that the hotel companies' duty of care to its patrons extended to the public sidewalk on the other side of the street.  The complaint specifically alleges that plaintiffs Miango, Likutu, and Kiyaya were located on the sidewalk across the street from the hotel to "protest[] against human rights violations in the DRC," Second Am. Compl. ¶ 118, and that plaintiff Ngoma came out of a different hotel to stand on the same sidewalk because he was "observ[ing] the protest." *Id.* ¶ 35.  Plaintiffs have not alleged that they were drawn to the sidewalk across the street for any "business-related purpose" connected to the hotel.  Nor have they alleged any facts indicating that the sidewalk served as the hotel's exit or "approach thereto," or that it was put to "substantial use" – or any use – by the Capella Hotel.  *Quigley's Pharmacy*, 261 A.2d at 244.  As the complaint notes, the sidewalk served other commercial enterprises, such as the Canal Inn Hotel where Ngoma worked.  *See* Second Am. Compl. ¶¶ 3, 27, 35.

Plaintiffs' only claim is that they "were in close proximity to the hotel when they were attacked," Second Am. Compl. ¶ 159, and that is simply not enough.  Plaintiffs were "attracted to the spot" where their alleged injuries occurred "not by anything the [hotel] did, but by [their] decision to [protest]." *Novak*, 452 F.3d at 909 (describing *Quigley's Pharmacy*).  Therefore, the

---

13      Plaintiffs attempt to argue that the hotel companies owe a duty of care to members of the general public who are not "'customers' or 'guests' of the hotel" because people "may freely ingress and egress the lobby of the hotel, and the outside surrounding areas of the hotel."  Pls.' Capella Opp. at 18.  But this expansive theory is not consistent with the law of the business-invitor, and even if it would apply to visitors in the lobby or at the front door, it does nothing to cover people standing across the street.

hotel companies did not owe plaintiffs a duty of care to protect them from harm under a business-invitor theory of liability.

> ### ii. The hotel companies did not owe plaintiffs a duty of care to protect them from the criminal acts of third parties.

Under some circumstances, a business may also be liable to its invitees under a negligence theory for injuries inflicted by acts of third persons if those acts are foreseeable. *Novak*, 452 F.3d at 911–12. To hold a defendant liable for injuries resulting from intervening criminal acts, "liability depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent." *Bd. of Trustees of Univ. of D.C. v. DiSalvo*, 974 A. 2d 868, 870 (D.C. 2009), quoting *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997). "Specifically, heightened foreseeability factors directly into the duty analysis because a defendant is only liable for the intervening criminal acts of another 'if the criminal act is so foreseeable that a duty arises to guard against it.'" *Id.* at 871, quoting *McKethean v. Wash. Metro. Area Transit Auth.*, 588 A.2d 708, 717 (D.C. 1991). "In this context, then, the requisite duty of care required for negligence is a function of foreseeability, arising only when foreseeability is alleged commensurate with the 'extraordinary nature of intervening criminal conduct.'" *Id.*, quoting *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 641 (D.C. 2005).

The heightened foreseeability standard "is premised on the assumption that the court must limit the extent to which defendants become the insurers of others' safety from criminal acts." *Id.*; *see Romero v. Nat'l Rifle Ass'n of Am.*, 749 F.2d 77, 81 (D.C. Cir. 1984) (reiterating the "general rule of nonliability at common law for harm resulting from the criminal acts of third parties"). Foreseeability cannot be based on generic information such as crime rates, *see Bailey v. District of Columbia*, 668 A.2d 817, 820 (D.C. 1995), or evidence that a defendant's employees worked in a "criminally active environment." *Clement v. Peoples Drug Store, Inc.*, 634 A.2d 425, 429 (D.C.

1993).  And even though a plaintiff is not required to show "previous occurrences of the particular type of harm," a plaintiff must present "a combination of factors" that would give the defendant "an increased awareness of the danger of a particular criminal act."  *District of Columbia v. Doe*, 524 A.2d 30, 33 (D.C. 1987).

Moreover, the foreseeability analysis takes into consideration the nature of the relationship between the parties.  *See Romero*, 749 F.2d at 81 (noting that the only District of Columbia cases to depart from the general rule of nonliability "involved either a special relationship between the parties to the suit . . . or a relationship of control between the defendant and the intervening criminal actor").  In order to determine a defendant's liability, courts use a "sliding scale":  [i]f the relationship between the parties strongly suggests a duty of protection, then specific evidence of foreseeability is less important, whereas if the relationship is not of a type that entails a duty of protection, then the evidentiary hurdle is higher."  *Workman v. United Methodist Comm. on Relief of Gen. Bd. of Glob. Ministries of United Methodist Church*, 320 F.3d 259, 263–64 (D.C. Cir. 2003).

District of Columbia courts have been "reluctant to see a defendant held liable for harm caused by the criminal act of a third party."  *Workman*, 320 F.3d at 262 (describing cases).  In the few cases where the courts have found sufficient evidence of foreseeability, the evidence has essentially indicated that it was just "a matter of time" until the crime occurred and that the relationship between the plaintiff and defendant "suggested the defendant should be held liable as a matter of policy."  *Id.* at 263–64; *see, e.g.*, *Doe*, 524 A.2d at 33 (upholding jury verdict after child was abducted from classroom and raped where plaintiff's evidence indicated that arson and robbery had occurred in the school's playground, sexual assaults and other violent activities had taken place in the surrounding area, and the school was not secure because there were broken

doors, open gates, and a malfunctioning intercom system); *Doe v. Dominion Bank of Wash.*, 963

F.2d 1552 (D.C. Cir. 1992) (reversing district court's grant of directed verdict in favor of defendant

landlord where, in the month preceding a tenant's rape on a vacant floor of an office building

during business hours, tenants had lodged a number of complaints about threatening intruders in

the building, and there had been reports of theft, drug use, and sexual activity in the building).

These cases are also all distinguishable because liability has generally only been found where the

defendant had some responsibility for the premises where the crime occurred.

This theory suffers from the same fundamental problem as the business invitee theory:

plaintiffs were not invitees, guests, or patrons of the hotel.  Moreover, plaintiffs have failed to

allege sufficient facts to state a plausible claim that it was foreseeable to the hotel companies that

the DRC security forces would attack individuals engaged in a protest across the street from the

Capella Hotel and that they bore some duty to prevent it.[14]  Although plaintiffs allege that they

"were in close proximity to the hotel when they were attacked," Second Am. Compl. ¶ 159, they

point to no facts that would give rise to a special relationship between the hotel companies and

plaintiffs.  Plaintiffs do not claim that they had any ongoing interactions with the hotel companies

or employees of the companies, and the hotel bore no responsibility for the protesters' care or well-

being, or the safety of the opposite sidewalk, so there is no relationship with defendants that

suggests they "should be held liable as a matter of policy."  *Workman*, 320 F.3d at 262.

Without any meaningful relationship between plaintiffs and the hotel companies, the only

way for plaintiffs to establish that the hotel companies owed them a duty of care would be to

---

14      Again, plaintiffs mischaracterize the nature of the Court's focus at the motion to dismiss
stage by contending that "the issue of foreseeability is a question for the jury and therefore should
not be resolved at this time."  Pls.' Capella Opp. at 21.

demonstrate defendants' "increased awareness of the danger of a particular criminal act." *DiSalvo*, 974 A.2d at 892, quoting *Doe*, 524 A.2d at 33.  But plaintiffs have not identified facts that add up to the sort of heightened awareness of the risk of a specific violent assault that could meet the high threshold in this case.

Plaintiffs claim that the hotel companies should have known that a "protest against the Kabila regime would occur near the hotel because of numerous human rights reports of protests against the Kabila regime, and because protests occurred for the past two days outside the hotel where the delegation of the Gambia was staying, which security forces of President Gemmah violently suppressed."  Second Am. Compl. ¶ 161.  They also claim that "[n]umerous media outlets reported the attacks [outside the Hays Adams Hotel in Washington, D.C.] on both dates." *Id.* ¶ 23.  However, "heightened foreseeability requires more precision" than just establishing "a general possibility" that a crime could occur.  *DiSalvo*, 974 A.2d at 872–73.

Although there are some similarities between the attacks on protesters in front of the Hays Adams Hotel and the beatings that plaintiffs suffered near the Capella Hotel, the attacks involved different African delegations and occurred in different locations in Washington, D.C.  Plaintiffs have not established that the hotel companies were aware of the events that had transpired the day before, and they have not alleged that the hotel companies were aware that protesters would be in their neighborhood the next day.  The complaint does not provide any facts that would tend to show that the hotel companies – even if they had some responsibility for the sidewalk across the street – would have been on notice that an attack on plaintiffs was more likely to occur there than any other crime.  *See id.*

Because plaintiffs' allegations do not satisfy the heightened foreseeability standard, plaintiffs have not established that the hotel companies owed them a duty of care to protect them from the criminal acts of third parties.

Therefore, the Court will dismiss Count XIII against the hotel companies.

## IV.  Plaintiffs' Loss of Consortium Claim

Because the Court finds that plaintiffs' negligence claims against MPD, the Secret Service, and the hotel companies all fail, the loss of consortium claim filed by plaintiff Miango and his wife, M. Miango, will also be dismissed.  *See Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 331 (D.C. 2007) (concluding that judgment for defendant was properly granted on the loss of consortium claim after plaintiff could not establish that defendant was negligent), citing *Massengale v. Pitts*, 737 A.2d 1029, 1033 (D.C. 1999).  Therefore, Count XVI against MPD, the Secret Service, and the hotel companies will be dismissed.

## CONCLUSION

For the foregoing reasons, the motions to dismiss filed by MPD, the Secret Service, and the hotel companies will be granted.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 22, 2017