# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JACQUES DIEUDONNE ITONG MIANGO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEMOCRATIC REPUBLIC OF CONGO<br>*Embassy of the Democratic Republic of the Congo, et al.*,<br><br>Defendants. | Civil Action No. 15-1265 (ABJ) |

## MEMORANDUM OPINION

Plaintiffs Jacques Miango, Matala Kayaya, and Ouwo Likutu allege that they were beaten by security forces of the Democratic Republic of the Congo ("DRC") when they participated in a protest across the street from the Washington, D.C. hotel where the DRC President and his delegation were staying. *See* Second Am. Compl. [Dkt. # 39] ¶¶ 21–26. According to the complaint, DRC security forces also stole multiple items from Miango's parked car. *See id.* ¶¶ 27–34. Plaintiffs Miango, Kayaya, and Likutu, along with Miango's wife Michelle Miango ("M. Miango") filed a lengthy complaint against the DRC and individual DRC officials, among others, pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605, setting forth multiple tort claims as well as several constitutional claims. *Id.* ¶¶ 117–132, 145–56, 173–82.

Pending before the Court are seven motions for default judgment against the DRC; its President, Joseph Kabila Kabange; Jean Marie Kassamba, a DRC press spokesman; and Jacques Mukaleng Makal, Raymond Tshibanda, Sam Mpengo Mbey, and Seraphin Ngwej, members of the President's entourage. *See* Mots. for Default J. [Dkt. ## 116–17, 119–23]. The Court initially found that plaintiffs did not provide sufficient justification through detailed affidavits or any other

documentation to support their claims or requested damages, and it ordered them to supplement their motions with "'satisfactory evidence' to prove that they have established their claim to relief and their entitlement to the amount of monetary damages requested." *See* Order [Dkt. # 124]. Plaintiffs have since supplemented their motions, *see* Pls.' Am. Mot. and Supp. Mot. for Default J. [Dkt # 128] ("Pls.' Am. Mot."); Exhibits to Pls.' Am. Mot. [Dkt. # 129], and while the submissions still leave something to be desired, the Court finds that it has grounds to grant all seven motions for default judgment and enter judgment in the amount of $562,660.06.

## BACKGROUND

The factual and procedural background of this case are laid out in detail in the Court's Memorandum Opinion granting motions to dismiss filed by other defendants – the District of Columbia Metropolitan Police Department, the United States Secret Service, Capella Hotel Groups, LLC, and Castleton Hotel Partners, LLC. *See Miango v. Democratic Republic of the Congo*, 243 F. Supp. 3d 113 (D.D.C. 2017). Therefore, the Court will address the facts only briefly here.

Plaintiff Jacques Miango is a refugee of the DRC who currently lives in Maryland with his wife. Second Am. Compl. [Dkt. # 39] ¶ 2. He describes himself as "a known opponent and activist against the DRC government['s] human rights violations." *Id.* Plaintiffs Kayaya and Likutu are Congolese by national original and are legal residents of Maryland. *Id.* ¶¶ 4–5.[1]

On August 6, 2014, plaintiffs Miango, Kayaya, and Likutu staged a protest against the DRC on the sidewalk across the street from the Capella Hotel. Second Am. Compl. ¶¶ 24, 27.

---

[1]    Although another plaintiff, Andre Paul Ngoma, is named in the complaint, plaintiffs do not seek default judgment on his behalf. *See* Second Am. Compl. ¶ 3 (describing Ngoma as someone who worked at the Canal Inn Hotel across the street from where the protest took place); Pls.' Am. Mot. at 1 (listing plaintiffs and only naming Miango, M. Miango, Kayaya, and Likutu).

Shortly after they arrived, plaintiffs saw the DRC's press official, defendant Jeanmarie Kassamba, returning to the hotel. *Id.* ¶ 27. Miango and his fellow protestors shouted at defendant Kassamba and held up signs condemning rape, corruption, genocide, dictatorship, and human rights violations in the DRC. *Id.* Defendant Kassamba entered the hotel and came back out with "apparent security enforcers of the Kabila regime." *Id.* ¶ 28. Plaintiffs claim that the DRC security forces approached Miango and "began belittling, threatening, intimidating and disrupting" him and the other protestors. *Id.* Soon after, President Kabila arrived at the hotel. *Id.* ¶ 31. Miango started shouting at him, and plaintiffs claim that the President recognized Miango as a "dissident." *Id.*

According to the complaint, after President Kabila entered the hotel, another group of DRC security forces "rushed out" of the building and joined the group already harassing Miango and the other protestors. Second Am. Compl. ¶ 32. They "immediately began physically attacking" the protestors, and though plaintiff Kayaya was able to escape, Miango was "knocked down to the ground, beaten, kicked, choked, and stomped on" by the security forces. *Id.* As a result, Miango lost several teeth and suffered a concussion and injuries to his spine and neck. *Id.* Plaintiffs allege that after the DRC security forces beat Miango, they broke into his parked car and stole protest materials, a computer, an iPod, a camera, and other property belonging to plaintiffs. *Id.* ¶ 34.

Plaintiffs filed their Second Amended Complaint on May 10, 2016, alleging various torts and constitutional claims against the DRC, Joseph Kabila Kabange, Jeanmarie Kassamba, Jacques Mukaleng Makal, Seraphin Ngwej, Raymond Tshibanda, Leonard Ngoy Lulu, Sam Mpengo Mbey, the United States Secret Service, District of Columbia Metropolitan Police Department ("MPD"), Castleton Hotel Partners LLC, and Capella Hotels Group LLC. *See* Second Am. Compl. The Court dismissed the claims against the Secret Service, MPD, Castleton Hotels and Capella

Hotels, *see Miango*, 243 F. Supp. 3d 113, and it terminated defendant Lulu since he was never

properly served.  *See* Min. Order (Dec. 15, 2016).  However, a number of counts remain:

- Count I:  Crimes Against Humanity in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count II:  Cruel and Degrading Treatment in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count III:  Deprivation of Constitutional and Civil Rights in Violation of 42 U.S.C. §§ 1983, 1988 (First Amendment Freedom of Speech and Assembly) against all defendants;

- Count IV:  Deprivation of Right to Enter One's Own Country in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count V:  Infringement Upon Rights to Free Expression, Assembly, Thought, and Association in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count VI:  Deprivation of Equal Protection Under the Law in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count VII:  Aiding and Abetting Acts in Violation of the Law of Nations and/or Treaty of the U.S. against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count VIII:  Battery against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count IX:  Assault against the individual/official capacity defendants, the DRC, Joseph Kabila, and the hotel companies;

- Count X:  Deprivation of Constitutional and Civil Rights in Violation of 42 U.S.C. §§ 1983, 1988 ("First Amendment Freedom of Speech And Assembly Clause, Fourth Amendment Due Process and Search and Seizure Clauses, Fifth Amendment Cruel and Unusual Punishment Clause, Fifth Amendment Takings Clause, and Fourteenth Amendment Equal Protection Clause") against the DRC and Joseph Kabila;

- Count XI:  Intentional Infliction of Emotional Distress against the individual/official capacity defendants, the DRC, and Joseph Kabila;

- Count XII:  False Imprisonment against the individual/official capacity defendants, the Democratic Republic of Congo Government, the Embassy of the Democratic Republic of Congo, and Joseph Kabila;

- Count XV:  Trespassing, Conversion and Theft against the individual/official capacity defendants, the Democratic Republic of Congo Government, Joseph Kabila, and the hotel companies; and

- Count XVI:  Loss of Consortium against all defendants.

The remaining defendants failed to file an answer or otherwise respond to plaintiffs' complaint.  On March 22, 2017, the Clerk of the Court entered default as to all seven defendants, *see* Clerk's Order of Default [Dkt. # 114], and plaintiffs have moved for default judgment against those defendants.  *See* Pls.' Am. Mot.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 55(a) provides that the clerk of the court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Fed. R. Civ. P. 55(a).  After a default has been entered, a party may apply to the Court for a default judgment pursuant to Rule 55(b).

Under the Foreign Sovereign Immunities Act, a court may not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("[W]hen the defendant State fails to appear and the plaintiff seeks a default judgment, FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'").  This standard is identical to the standard for entry of default judgments against the United States under Federal Rule of Civil Procedure 55(d).  *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).

Given the considerations of sovereign immunity that pertain notwithstanding the default, a court must carefully scrutinize the plaintiff's allegations and "may not unquestioningly accept a

complaint's unsupported allegations as true." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). In a default proceeding under the FSIA, a plaintiff may establish proof through testimony, documentation, and affidavits. *Id.*; *Spencer v. Islamic Republic of Iran*, 922 F. Supp. 2d 108, 109 (D.D.C. 2013), citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006).

## ANALYSIS

### I.  The Court has jurisdiction over plaintiffs' claims under the FSIA.

At the outset, plaintiffs must demonstrate that the Court has jurisdiction to hear their claims and that the Democratic Republic of the Congo is not immune from suit.

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Foreign sovereigns enjoy immunity from suit in the United States unless the case falls within one of several specified exceptions. *See* 28 U.S.C. §§ 1604–1606.

Included in the lengthy complaint are a number of tort claims: assault, battery, false imprisonment, trespassing conversion and theft, and intentional infliction of emotional distress. There is an exception set forth in the FSIA for non-commercial torts, which confers jurisdiction in any case:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5). In other words, "[s]ection 1605(a)(5) is essentially a respondeat superior statute, providing an employer (the foreign state) with liability for certain tortious acts of its employees." *Skeen v. Federative Republic of Brazil*, 566 F. Supp. 1414, 1417 (D.D.C. 1983);

*Guzel v. State of Kuwait*, 818 F. Supp. 6, 10 (D.D.C. 1993) ("Whether an employee is acting 'within the scope of his office or employment' for purposes of the FSIA is governed by the applicable local law of *respondeat superior*.").

Under the FSIA, the foreign state "shall be liable in the same manner and to the same extent as a private individual under like circumstances," except that a foreign state "shall not be liable for punitive damages." 28 U.S.C. § 1606. Therefore, "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983); *see also Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224, 2005 WL 756090, at *8 (D.D.C. Mar. 29, 2005) (describing section 1606 as a jurisdictional "pass-through" to traditional causes of action available to plaintiffs against private actors). Thus, a plaintiff proceeding under the FSIA "must show that the defendants' acts would give [rise] to liability if viewed through the lens of tort law." *Reed*, 845 F. Supp. 2d at 212, citing *Rimkus*, 750 F. Supp. 2d at 175.

Because the FSIA requires the application of state law, the Court will apply the law of the District of Columbia.[2]  The District of Columbia Court of Appeals has established a two-prong test to determine the liability of an employer for torts committed by an employee.  First, the tort must be actuated, at least in part, by a purpose to further the employer's business, and second, the tort must not be unexpected in view of the employee's duties.  *See Weinberg v. Johnson,* 518 A.2d 985, 990 (D.C. 1986).

Although plaintiffs do not address this legal issue directly, and they simply assume that the "foreign state's immunity has been lifted under Section 1605 and jurisdiction is proper," Pls.' Am. Mot. at 8, plaintiffs have provided sufficient evidence for the Court to conclude that the named defendants were acting within the scope of their employment as security officials of the DRC when they committed the acts alleged in the complaint.

In their complaint, plaintiffs state that "abuse of political freedoms has been pervasive under the [Kabila] regime," and that the DRC government is known for threatening human rights advocates and members of the political opposition through its use of State Security Forces ("SSF").  *See* Second Am. Compl. ¶ 19.  They allege that SSF members "beat and detain individuals who

_____

2       In their supplemental motion, plaintiffs contend that "the applicable state law is the State of Maryland, where the [p]laintiffs are domicile[d]."  Pls.' Am. Mot. at 9.  Under the choice of law principles of this forum – the District of Columbia – courts employ a refined governmental interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Hercules & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 41 (D.C. 1989), quoting *Kaiser-Georgetown Comm. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985).  Although plaintiffs have a connection to Maryland, there is nothing connecting that jurisdiction to the causes of action in the complaint.  All of the injuries and losses plaintiffs allegedly suffered resulted from actions that took place in the District of Columbia, and the District has a stronger interest than Maryland does in setting standards and expectations for how foreign diplomats may behave when they visit Washington, D.C.  *See Hercules*, 566 A.2d at 42 (concluding that Virginia had a stronger interest in setting architectural standards in connection with renovation projects in Virginia, and that Virginia had more significant contacts with the claims).

participate in demonstrations and protests in the DRC," and that President Kabila's government had previously "unleashed its security forces resulting in deaths . . . with hundreds of others brutalized and arrested." *Id.* ¶ 20.

In detailed affidavits provided to the Court, plaintiffs described how Mr. Kassamba and "a group of Congolese officials [] angrily approached" plaintiffs, and that once President Kabila arrived, another "group from [his] entourage[] rushed out of the [hotel] and joined Mr. Kassamba . . . [and] immediately began physically attacking" plaintiffs. *See* Ex. 1 to Pls.' Am. Mot. [Dkt. # 129-1] ("Miango Aff.") ¶¶ 6–7; Ex. 3 to Pls.' Am. Mot. [Dkt. # 129-3] ("Kayaya Aff.") ¶¶ 6–7. Plaintiffs allege that President Kabila's security forces were comprised of SSF agents "who had previously intimidated, harassed, threatened, beaten, and unlawfully detained, murdered, and tortured dissidents against the Kabila regime." Second Am. Compl. ¶ 22. More importantly for these purposes, they also allege, although somewhat conclusorily, that the official capacity defendants named in the lawsuit "were acting under the color of state authority and/or the actual and/or apparent authority of [d]efendants DRC and Kabila" when they attacked plaintiffs, and that the DRC is "liable under the doctrine of respondeat superior and/or via direct order and/or via command responsibility." *See, e.g.*, *id.* ¶¶ 119, 130, 148, 154, 175. And in support of the motion for default judgment, plaintiffs provided the Court with records obtained from the U.S. Department of State that confirm that the "security guards involved in the altercation arrived on the plane" with President Kabila, and that the Department of State "consider[ed] them part of the [President's] entourage." *See* Ex. 5 to Pls.' Am. Mot. [Dkt. # 129-5].

Based on the evidence provided to the Court, including the fact that the alleged assault took place immediately after plaintiffs were observed by the DRC President, and that it was carried out by individuals in his entourage against people who were obviously involved in a protest, the Court

concludes that there is a satisfactory basis to find that defendants were acting within the scope of their employment when they committed the acts alleged in the complaint.[3] Since the Court has jurisdiction over the action, it must determine whether plaintiffs have established defendants' liability and the amount of any damages suffered.

## II. The Court will grant plaintiffs' motion for default judgment because defendants' acts would give rise to tort liability.[4]

### A. Battery

Plaintiffs argue that they are entitled to default judgment against defendants because their acts would give rise to liability for, among other things, the common law tort of battery and the derivate claim of loss of consortium.[5] Pls.' Am. Mot. at 10–11. Under District of Columbia law, "[a] battery is an intentional act that causes a harmful or offensive bodily contact." *Evans-Reid v.*

---

3       Despite defendant's failure to address the issue, the Court must consider whether either of the exceptions to liability for tortious acts found in section 1605(a)(5) applies in this instance. *See Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980). The claims here do not arise "out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," 28 U.S.C. § 1605(a)(5)(B), and the discretionary function exception, *id.* § 1605(a)(5)(A), does not apply because "there is no discretion to commit, or to have one's officers or agents commit, an illegal act." *Letelier*, 488 F. Supp. at 673 (concluding that it had jurisdiction over plaintiff's tort claims under section 1605(a)(5) against the Republic of Chile for its alleged involvement in a political assassination conducted by persons who acted at the direction of the Chilean government), citing *Cruikshank v. United States*, 431 F. Supp. 1335, 1359 (D. Haw. 1977).

4       Plaintiffs assert other causes of action in addition to the common law tort claims in their Second Amended Complaint. Since the Court has concluded that plaintiffs may recover under these causes of action, it need not address other possible grounds of liability. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 133 n.3 (D.D.C. 2005) (finding liability and damages for state law claims of assault, battery, and intentional infliction of emotional distress pursuant to FSIA, and declining to address other grounds for liability).

5       Plaintiffs' other tort claims include assault, intentional infliction of emotional distress ("IIED"), and false imprisonment. *See* Second Am. Compl. Since multiple recovery is prohibited, and plaintiffs can only recover damages stemming from the attack under one of these theories, the Court need only analyze the battery claim. *See Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 23 (D.D.C. 2016) (allowing recovery under the battery claim only and not also under the IIED claim).

*Dist. of Columbia*, 930 A.2d 930, 937 (D.C. 2007), quoting *Etheredge v. Dist. of Columbia*, 635 A.3d 908, 916 (D.C. 1993).

The Court is satisfied that plaintiffs have established the necessary elements of their battery claim. In addition to the allegations in the complaint, plaintiffs have provided the Court with highly detailed affidavits describing the protest, the attack, and the injuries each plaintiff suffered in the wake of the attack. *See* Miango Aff.; Kayaya Aff.; Ex. 2 to Pls.' Am. Mot. [Dkt. # 129-2] ("M. Miango Aff."); Ex. 4 to Pls.' Am. Mot. [Dkt. # 129-4] ("Likutu Aff."). The evidence shows that a group of Congolese officials approached Miango and Kayaya and began to threaten them and disrupt their protest, and that once President Kabila arrived, more officials rushed out of the hotel and perpetrated a physical attack. *See* Miango Aff. ¶¶ 6–7; Kayaya Aff. ¶¶ 6–7; Likutu Aff. ¶¶ 6–8. At that point, plaintiff Miango was "knocked to the ground, beaten, kicked, punched, choked and stomped on mercilessly," plaintiff Kayaya was "grabbed" by a Congolese official "who began kicking and punching" him, and plaintiff Likutu was dragged out of the car, punched "in the head and . . . kicked . . . from behind," and his head was "slammed . . . on the bonnet of the car." *See* Miango Aff. ¶¶ 6–7; Kayaya Aff. ¶¶ 6–7; Likutu Aff. ¶ 9.

The Court therefore concludes that defendants' acts would give rise to liability for the tort of battery, and defendants must be held liable for plaintiffs' injuries under the FSIA.

### B.     Loss of Consortium

The Court is also satisfied that plaintiffs Miango and M. Miango have established the necessary elements of their loss of consortium claim. For loss of consortium, the District of Columbia applies the law of the state where the marriage is domiciled. *Hartley v. Dombrowski*, 744 F. Supp. 2d 328, 339 (D.D.C. 2010), citing *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 13 (D.D.C. 1995); *see also Logan v. Providence Hosp., Inc.*, 778 A.2d 275, 280 (D.C. 2001)

(observing that courts need not decide all issues under a single jurisdiction's law). That is because that state has a significant governmental interest "in regulating the legal rights of [its] married couples." *Stutsman v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.*, 546 A.2d 367, 376 (D.C. 1988). Therefore, plaintiffs' loss of consortium claim is governed, as they suggested, by Maryland law, since that is where plaintiffs' marriage is domiciled and the injury to the marital relationship was suffered. *See* Pls.' Am. Mot. at 9, 12.

"A claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party." *Oaks v. Connors*, 660 A.2d 423, 428 (Md. 1994), citing *Deems v. W. Md. Ry. Co.*, 231 A.2d 514 (Md. 1967). This claim "is derivative of the injured spouse's claim for personal injury." *Id.* at 430. When either spouse "claims loss of consortium by reason of physical injuries sustained by the other . . . that claim can only be asserted in a joint action for injury to the marital relationship," *Deems*, 231 A.2d at at 525, in order to avoid duplication of awards. *Oaks*, 660 A.2d at 428.

Both plaintiffs provided affidavits detailing the various marital problems they have faced since Miango was attacked. They averred that as a result of the injuries Miango suffered at the hands of defendants, both plaintiffs became withdrawn from one another. *See* Miango Aff. ¶ 11; M. Miango Aff. ¶ 6. Plaintiff M. Miango stated that her husband "was unable to effectively provide [her] with affection and [their] sexual relationship became impaired." M. Miango Aff. ¶ 6. Further, "[f]or several months after the brutal attack . . . he could not perform his routine or regular duties in [their] home and marital relationship." *Id.* For example, Miango "was unable to effectively assist with household chores, or participate in activities" with their children. *Id.* Based on the affidavits, the Court concludes that plaintiffs have provided the Court with satisfactory

evidence to make out a claim for loss of consortium. Accordingly, plaintiffs are entitled to recover for their injuries.

### C.    Conversion[6]

Plaintiffs have also provided the Court with satisfactory evidence to prove their claim of civil conversion. "The essence of conversion is a wrongful taking or a wrongful retention of property after a rightful possession." *Shehyn v. Dist. of Columbia*, 392 A.2d 1008, 1012 (D.C. 1978); *see also Baltimore v. Dist. of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011) ("The tort of conversion involves 'an unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property.'"), quoting *Dennis v. Edwards*, 831 A.2d 1006, 1013 (D.C. 2003). And the personal property at issue in a conversion claim is generally chattel. *Papageorge v. Zucker*, 169 A.3d 861, 864 (D.C. 2017).

In their complaint, plaintiffs allege that defendants raided Miango's parked car, "ransacked" it, and stole multiple items. *See* Second Am. Compl. ¶¶ 173–77. In support of this allegation, plaintiff Miango averred that right after he was attacked, he "saw the Congolese officials raiding [his] car and removing items from [it] and taking the items into the [hotel]." Miango Aff. ¶ 9. Plaintiff Lituku stated that when he returned to the car, he "saw that all [his] belongings were missing," and plaintiff Kayaya added that defendants "tore up the car." Likutu Aff. ¶ 11; Kayaya Aff. ¶ 9.

The Court concludes that defendants' acts would give rise to liability for the tort of civil conversion, and defendants must be held liable for plaintiffs' loss of property under the FSIA. Because defendants' acts would give rise to liability for battery, loss of consortium, and civil

---

6    Plaintiffs' cause of action is entitled "Trespassing, Conversion and Theft," but it appears that the District of Columbia recognizes "conversion" as an independent tort and so the Court need only address that cause of action.

conversion, the Court will grant plaintiffs' motion for default judgment against all seven defendants.

### III.    The Court will award plaintiffs some of their requested damages.

Plaintiffs seek a declaratory judgment and "[c]ompensatory damages to compensate for the actual harm inflicted on plaintiffs." Pls.' Am. Mot. at 13.[7]  Although section 1608(e) governing default judgments under FSIA is silent on damages, the D.C. Circuit has held that "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill*, 328 F.3d at 683–84 (citation omitted).  This means that a "plaintiff may recover damages for past economic losses if such losses are 'reasonably proved,'" while a plaintiff may recover for future harm if the plaintiff proves "that the projected consequences are 'reasonably certain' (i.e. more likely than not) to occur," and can prove "the amount of damages by a 'reasonable estimate.'"  *Hill*, 328 F.3d at 684, citing Dan B. Dobbs, Dobbs Law of Remedies § 8.1(2) at 361–62, § 8.1(7) at 407 (2d ed. 1993) and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1932).

The Court may rely on affidavits or documentary evidence "to determine the appropriate sum for the default judgment." *Int'l Painters & Allied Trades Indus. Pension Fund v. RW Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002), citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979).  And it "has considerable latitude in determining the amount of damages." *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011), citing *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir. 1993).

---

7    Plaintiffs ask the Court to declare defendants' actions unconstitutional and illegal.  Second Am. Compl. ¶ 183(a).  Given the entry of judgment on the tort claims, the Court will not reach the constitutional claims predicated on 42 U.S.C. § 1983, which do not appear to fall clearly within any of the FSIA exceptions and which require a state actor in any event.  *See* Second Am. Compl. ¶¶ 61–71, 133–144.

Plaintiffs have requested the following in damages:

- $20,214.69 for plaintiff Miango's medical expenses;

- $500,000.00 in loss of consortium and pain and suffering damages for plaintiff Miango;

- $150,000.00 in loss of consortium damages for plaintiff M. Miango;

- $250,000.00 each in pain and suffering damages for plaintiff Kayaya and plaintiff Likutu; and

- $2,797.00, $700.00, and $1,490.00 for stolen property for plaintiff Miango, plaintiff Kayaya, and plaintiff Likutu, respectively.[8]

*See* Pls.' Am. Mot. at 13, 16–17.

## A. Economic Damages

"Under FSIA, injured victims may recover economic damages, which typically include lost wages (both past and future), benefits and retirement pay, and other out-of-pocket expenses." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 24 (D.D.C. 2016), citing *Owens v. Republic of Sudan*, 71 F.Supp.3d 252, 258 (D.D.C. 2014). Here, plaintiff Miango requests $20,214.69 for his medical bills and expenses. Pls.' Am. Mot. at 13.

Miango asserts that he underwent significant medical treatment following his attack, including treatment to relieve the pain caused by a cervical sprain, physical therapy for his back

---

8 In their complaint, plaintiffs also sought "[c]onsequential damages for the natural consequential damages flowing from the harm; [p]unitive damages, [n]ominal damages; [and] award of reasonable attorney fees and litigation cost." Second Am. Compl. ¶ 183; *see also* Pls.' Am. Mot. at 12. However, a foreign state cannot be liable for punitive damages under the FSIA. *See* 28 U.S.C. § 1606. And in any event, plaintiffs' motion only addresses two forms of relief: declaratory judgment and compensatory damages. Therefore, the Court will not consider an award of additional damages beyond those at this time.

and neck, and dental work to repair the damage to his teeth. Miango Aff. ¶ 10. He has substantiated these assertions by submitting medical records from Patient First, Baltimore Back and Pain Center, Good Samaritan Hospital, and his dentist, Dr. Mitcherling. *See* Att. B, C, D, and E to Miango Aff. [Dkt. # 129-1].

Miango also provided the Court with a list of "Medical Expense Records," which details the amount of each medical bill he has received since the incident. *See* Ex. 8 to Pls.' Am. Mot. [Dkt. # 129-8] ("Medical Expense List"). The list is a somewhat sloppy attempt to calculate his total medical expenses, and it contains numerous errors that arise from the double counting of various bills.[9]

For example, Miango was treated by Dr. Mitcherling right after the incident in order to repair the damage to his teeth and mouth. According to the bill from Dr. Mitcherling's office dated September 13, 2014, as well as the Statement of Benefits from plaintiff's insurance company dated September 4, 2014, the total cost of Miango's dentistry work was $2,216.00. *See* Docs. 2 and 4 to Medical Expense List. Over the next several months, Miango received multiple statements reflecting an outstanding balance due to Dr. Mitcherling, some of which included late service charges. *See* Docs. 5, 9–11, 16–17 to Medical Expense List. Instead of adding the service charges to the original balance, plaintiff includes each statement balance on the Medical Expense List, and he adds them together to request a total of approximately $13,490.00 for "out-of-pocket" expenses owed to Dr. Mitcherling. This must be reduced to reflect the actual price of the dental care.

---

9       Some of the documents plaintiff provides consist of actions to collect previous balances from bills already accounted for on the list. *See* Docs. 12 and 14 to Medical Expense List. And some of the expenses on the list are inaccurate. For example, plaintiff Miango reported the wrong amount for the bill from Quest Diagnostics in Document 8. *See* Doc. 8 to Medical Expense List (listing the amount as $258.28 when the bill was for $225.28).

Miango is entitled to recover the cost of his dentistry work, and the Court is inclined to award him the $221.06 in additional charges he incurred in late fees and service charges since he should not be penalized for his inability to pay for costly injuries caused by defendants. Additionally, plaintiff received lab work at Dr. Mitcherling's request, billed by Quest Diagnostics, for $225.28, and he appears to have received dental care at the University of Maryland School of Dentistry at a cost of $147.00. *See* Docs. 8 and 18 to Medical Expense List. So, the Court will award plaintiff Miango a total of $2,809.34 for the costs incurred for dental care.

With regard to the other injuries Miango suffered, plaintiff averred that he "went to Patient First where [he] was evaluated, diagnose[d] with [a] Cervical Sprain and an x-ray of [his] Cervical spine [was] done." Miango Aff. ¶ 10. Plaintiff includes two entries from Patient First on his Medical Expense List, but because he counted the cost of his prescriptions ($30) twice, his request for damages is too high. Based on the Court's review of the Patient First bill, plaintiff's out-of-pocket expense for his treatment was $453.00. *See* Docs. 1 and 7 to Medical Expense List.

Plaintiff also went to Good Samaritan Hospital, where he was treated in the Emergency Room on August 7, 2014, and where he later returned for physical therapy. Miango Aff. ¶ 10. He provides bills from MedStar Health and Akron Billing Center for $1,041.92 and $1,086.00, respectively, for services received during the emergency room visit, *see* Docs. 6 and 13 to Medical Expense List, as well as bills for $273.26 and $234.00 from MedStar Health for physical therapy and office visits. *See* Docs. 15 and 19 to Medical Expense List. Further, plaintiff underwent physical therapy at Baltimore Back and Pain Center and submitted bills with an outstanding balance of $1,375.54. *See* Doc. 20 to Medical Expense List.

Based on the evidence presented, the Court will award plaintiff Miango a total of $7,273.06 for his medical and dental expenses.

### B.  Pain and Suffering Damages

In an action for personal injury, a plaintiff is entitled to recover compensation "for the loss and damage caused to him" by defendants, including "not only expenses incurred for medical attendance, [but] a reasonable sum for his or her pain and suffering." *Vicksburg & M.R. Co. v. Putnam*, 118 U.S. 545, 554 (1886).  Courts determine the amount of pain and suffering damages by considering various factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of impairment that will remain with the victim for the rest of his or her life." *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 259 (D.D.C. 2014), quoting *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012).

There is a dearth of case law on the appropriate amount of damages to award under the FSIA for pain and suffering under the tortious act or omission exception.  Courts in this district have developed a general framework for assessing pain and suffering awards for victims of terrorist attacks under the state-sponsored terrorism exception, and typically, plaintiffs who suffer minor injuries or emotional injuries only may receive close to $1.5 million, while those who suffer more serious injuries can receive over $7 million. *Owens*, 71 F. Supp. 3d at 259.  Under those circumstances, plaintiffs' more modest demands are largely reasonable.  However, for the reasons set forth below, it will award each plaintiff only some of his or her requested damages.

### 1.  Plaintiffs Miango and Michelle Miango

Plaintiff Miango and his wife maintain that they are entitled to pain and suffering damages as well as loss of consortium damages.  Pls.' Am. Mot. at 16.  Specifically, plaintiff Miango requests damages of $500,000.00, and plaintiff M. Miango requests damages of $150,000.00. *Id.*

To support their request for damages, each plaintiff provided the Court with an affidavit.

Miango averred that he "suffered immense anxiety and emotional distress because of the [d]efendants' actions," and that he felt not only "depressed, anxious and stressed over the incident," but also embarrassed about how he was attacked. Miango Aff. ¶ 11. Further, he "did not want to socialize and was withdrawn from [his] children and wife," and he lived in fear that the Kabila regime would retaliate against him and harm his family. *Id.* As a result, he has had indigestion, headaches, migraines, low energy, and trouble sleeping. *Id.* His wife, Michelle Miango, stated that as a result of the attack, their marriage has suffered. M. Miango Aff. ¶ 6. She avers that Miango has been unable to fulfill his role as a husband and father, and that their sexual relationship was impaired. *Id.*

As discussed above, plaintiffs' loss of consortium claim is governed by Maryland law, while Miango's battery claim is governed by District of Columbia law. Damages awarded from an action for loss of consortium are defined as "noneconomic damages," *Oaks*, 660 A.2d at 429; *see also* MD. Code Ann., Cts. & Jud. Proc. § 11-108(a)(2)(i),[10] and Maryland caps noneconomic damages awards at $350,000.00. MD. Code Ann., Cts. & Jud. Proc. § 11-108(b)(1). Because a loss of consortium claim is a derivative cause of action, and because plaintiffs must bring a joint claim to avoid duplicative damages awards, "a single cap for noneconomic damages applies to the whole action." *Oaks*, 660 A.2d at 430; *see also Deems*, 231 A.2d at 525. Therefore, if the Court decides to award the two plaintiffs damages for their loss of consortium claim, which is derivative of plaintiff Miango's battery claim, their total amount of non-economic damages must be capped at $350,000.00.

---

10    "'Noneconomic damages' means '[i]n an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury.'" MD. Code Ann., Cts. & Jud. Proc. § 11-108(a)(2)(i).

Looking at the entire set of facts and circumstances here, including the disproportionate relationship between the large sum sought for pain and suffering and the amount of the actual medical expenditures, the lack of any medical evidence to support Miango's claims of ongoing physical manifestations of anxiety, and the fact that plaintiffs' loss of consortium claim is subject to a cap under Maryland law, the Court concludes that an award of $350,000.00 in total non-economic damages is sufficient.

Therefore, the Court will award plaintiff Miango a total of $350,000.00 in damages, which, according to Maryland law, will also serve to compensate M. Miango. *See Oaks*, 660 A.2d at 429 ("Since an award for 'loss of consortium' presupposes the existence of an intact marital relationship that can be damaged, we believe that couples in this situation should be able to, and responsible for, deciding how to allocate the money they are awarded . . . .").

### 2.    Plaintiffs Kayaya and Likutu

Plaintiffs Kayaya and Likutu each request pain and suffering damages in the amount of $250,000.00 each, and they provide affidavits in support of their requests.

Plaintiff Kayaya averred that he lives in fear of his and his family's safety, and that he has felt "tremendously embarrassed and humiliated" by what happened to him, as well as "depressed, anxious and stressed." Kayaya Aff. ¶ 10. He "lost interest in leisure activities," has trouble sleeping, lost his appetite and suffers from indigestion when he can eat. *Id.* Plaintiff Likutu expressed almost identical sentiments in his affidavit, *see* Likutu Aff. ¶ 12, and he also has the support of his cousin, Ruddy Banu Sabua, who averred that Likutu was "sad, nervous and fearful" after the incident and now experiences anxiety in his profession as a photographer." Ex. 9 to Pls.' Am. Mot. [Dkt. # 129-9] ("Sabua Aff."). Although plaintiffs were involved in the protest, they have not provided the Court with evidence of any physical injuries resulting from the attack, or

any medical records memorializing the symptoms of ongoing stress. Based on all of the evidence submitted, the Court will award each of them $100,000.00 in damages for pain and suffering.

### C. Damages for Stolen Property

Plaintiffs Miango, Kayaya, and Likutu also request damages for the property that defendants stole from Miango's parked car outside of the hotel on the day of the incident. Pls.' Am. Mot. at 17. The usual "measure of damages for conversion of property is the 'fair market value of the property at the time of the conversion.'" *Trs. of Univ. of D.C. v. Vossoughi*, 963 A.2d 1162, 1175 (D.C. 2009), quoting *Maalouf v. Butt*, 817 A.2d 189, 190 (D.C. 2003). "Where the lost property . . . is replaceable, it is appropriate to measure damages for its loss by the cost of replacement." *Id.* at 1176, citing Restatement (Second) Torts § 911 cmt. e.

All three plaintiffs have provided reasonable estimates of the value of each item that was stolen. *See Hill*, 328 F.3d at 684. Plaintiff Miango requests a total of $2,797.00 for: a Dell laptop computer valued at $1,700.00; a Google Glass valued at $125.00; two Panasonic cameras valued at $250.00 each; one Sony camera valued at $400.00; and a 64 gigabyte memory card stolen from a second camera valued at $72.00. Miango Aff. ¶ 9. Plaintiff Kayaya requests $700.00 for "a Canon T3i camera with a value of about $700." Kayaya Aff. ¶ 9. And plaintiff Likutu requests $1,490.00 for his stolen wallet, which contained $100.00 of his own cash and $900.00 in cash that he had collected from his co-tenants to pay rent; two 32 gigabyte memory cards valued at $90.00 total; and two Canon camera lenses valued at $400.00 each. Likutu Aff. ¶ 11.[11] Therefore, the

---

[11] Although plaintiff Likutu only requests $1,490.00 for his stolen belongings, the Court notes that the total for all of the items equals $1,890.00. *See* Pls.' Am. Mot. at 17; Likutu Aff. ¶ 11. It is unclear to the Court if there is an error in the motion or the affidavit. Since an affidavit is plaintiff's sworn testimony, the Court will award plaintiff Likutu the amount he swears to have lost in his affidavit.

Court will award plaintiff Miango $2,797.00, plaintiff Kayaya $700.00, and plaintiff Likutu $1,890.00 for their stolen property.

## CONCLUSION

For the foregoing reasons, the Court will grant plaintiffs' motions for default judgment against all seven defendants in this matter.

The Court will award plaintiff Miango $360,070.06 in damages; plaintiff Kayaya $100,700.00; and plaintiff Likutu $101,890.00.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  January 16, 2018